**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| STEPHEN LEONARD, on behalf of himself and all others similarly situated,<br>45713 North Maxine Way,<br>Great Mills, MD 20634 USA<br>(County of Residence: St. Mary's County)<br><br>Plaintiff,<br>v.<br><br>AFTERSHIP INC.,<br>2711 Centerville Rd,<br>Wilmington, DE 19808 USA<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Stephen Leonard brings this action on behalf of himself, and all others similarly situated, and alleges upon information and belief based, among other things, upon the investigation made by Plaintiff and through his attorneys, as follows:

## INTRODUCTION

1. This is a proposed class action seeking monetary damages, restitution, and public injunctive and declaratory relief from Defendant Aftership Inc. ("Defendant" or "Aftership") arising from its deceptive addition of junk fees to consumers' shopping carts.

2. When consumers browse products on e-commerce websites, the e-commerce website will advertise the price of its retail items, along with an advertisement for either free or flat rate shipping. Those pricing representations are false, however, because e-commerce retailers, working with Aftership, surreptitiously add junk fees to consumer purchases, including Aftership's so-called "Aftership Protection" fee.

3. As discussed in detail herein, the assessment of these fees is deceptive and unfair. Aftership designed a widget that automatically adds "Aftership" at a late check-out stage and forces consumers to take affirmative action to reject the fee. Further, a reasonable consumer has more reason to confuse the "Aftership" fee, automatically added to its cart, as mandatory rather than optional because the fee is separate from any basic free shipping promised by the e-commerce retailers. Thousands of e-commerce customers like Plaintiff have been assessed hidden charges for which they did not bargain due to Aftership's deceptive and unfair tactics. The practice artificially inflates the advertised value of the transaction and deceives consumers regarding the actual cost of their purchases.

4. Thousands of e-commerce customers like Plaintiff have been assessed hidden shipping charges for which they did not bargain due to Defendant's deceptive tactics.

5. Plaintiff seeks damages and, among other remedies, public injunctive relief that fairly allows consumers to decide whether they will pay shipping costs.

**PARTIES**

6. Plaintiff Stephen Leonard is a citizen and resident of Great Mills, Maryland.

7. Defendant Aftership is a Delaware corporation. Defendant is an app on the platform Shopify that offers various widgets for e-commerce websites.

**JURISDICTION**

8. This Court has original jurisdiction over this action, including under the Class Action Fairness Act of 2005. Original jurisdiction is proper under 28 U.S.C. §§ 1332(d)(2) and (6) because: 1) the proposed Class is comprised of at least 100 members; 2) at least one member of the proposed Class resides outside California; and 3) the aggregate claims of putative Class members exceed $5 million, exclusive of interest and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Aftership is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. The Rise of Aftership

10. Aftership offers various services to e-commerce retailers related to shipping, including the implementation of its purported "Aftership Protection" fee.

11. Aftership ingratiates itself with e-commerce retailers by promising it can help retailers make more money from the shipping rates they charge consumers.

12. On information and belief, Aftership allots a certain percentage of fees paid to the online merchants that integrate the Aftership platform.

13. But the way in which Aftership provides value to e-commerce retailers is by deceptively adding incremental increases in a consumer's purchase price. As described herein, Aftership directs e-commerce retailers who use its services to install a widget on its website. That widget adds a hidden, *pre-selected* box or toggle that automatically adds junk fees like "Aftership Protection" fees to all orders. This method of adding fees is designed to go undetected by consumers and thus provide additional revenue to both Aftership and e-commerce retailers who use it.

14. On information and belief, Aftership designs the interface presented by merchants to consumers regarding the add-on fee, including the name of the fee, the time at which the fee is first mentioned during the checkout process, the time at which the fee amount is added to the purchase price, and the pre-selection of the box or toggle for the fee. On information and belief,

Aftership also uses sales tactics that pressure merchants into pre-selecting boxes or toggles at checkout that automatically add the "Aftership" fees by default.

15. In essence, Aftership partners with e-commerce retailers to insert additional charges into consumers' online shopping carts through its checkout widget marketed as "Aftership," or something similar. These fees are added after consumers are initially shown product prices and representations that shipping is either "free" or available at a flat rate.

16. Aftership's representations are deceptive because consumers are not told, at the time they begin shopping or decide to purchase, that Aftership's additional fees will later be added to the transaction. Instead, Aftership's checkout technology is designed to introduce these charges late in the checkout process, after consumers have already invested time selecting products, entering payment information, and proceeding toward final purchase.

17. Aftership intentionally designed its checkout widget to maximize consumer enrollment in these add-on fees through the use of dark-pattern techniques. Specifically, Aftership's widget automatically opts consumers into "Aftership Protection" fees through pre-selected checkboxes, toggles, or similar mechanisms that consumers must affirmatively locate and deselect to avoid being charged.

18. The design and placement of Aftership's widget are intended to cause consumers to overlook the additional charges or to believe that the charges are mandatory components of shipping or checkout rather than optional add-on products. The fees are presented in a manner that obscures their optional nature and materially interferes with consumers' ability to make informed purchasing decisions.

19. The Wall Street Journal highlights the problem, stating:

> Some brands automatically add optional coverage to orders. ***Customers have complained the fees are disclosed in small fonts, made to appear mandatory when***

***they are not or are displayed late in the online checkout process***.

Imani Moise, *Porch Pirates Are Now Raising the Price You Pay at Checkout*, Wall Street Journal, December 25, 2024, available at https://www.wsj.com/personal-finance/package-theft-hidden-fee-higher-prices-325c4a34?mod=Searchresults_pos3&page=1 (emphasis added).

20. Upon information and belief, Defendant encourages and designs its widget to automatically add "Aftership" fees to customer orders reasonably assuming most consumers will unknowingly purchase the protection, providing retailers the Aftership widget which, "increases revenue." While Aftership offers merchants the option of having customers affirmatively opt in, Aftership actively discourages merchants from undertaking this customer-friendly practice.

21. Worse, Aftership's widget automatically opts consumers into additional shipping-related junk fees even when consumers have already paid for third party carrier shipping fees via the e-commerce website or obtained free shipping if the customer reached a certain purchase price threshold.

## II. Aftership Surreptitiously Adds Fees to Consumers' Carts

22. Here's how Aftership's deception works, using Flag Nor Fail's shopping and checkout process as an example. When a consumer selects an item to purchase on the merchant's website, the customer is informed that free shipping is available for orders over $175.00. There is no mention of a "Aftership Protection" fee at this point.




23. Once the customer clicks the "ADD TO CART" button the consumer is taken to their cart. The cart is riddled with deception due to Aftership's widget. The consumer, anxious to checkout and resume their purchase, is presented with a giant yellow "CHECKOUT PLUS" button, which inflates the price to add shipping protection. A consumer that does not want or need shipping protection is forced to hunt to find a way to remove it. In small barely noticeable font, the consumer can select "Checkout without shipping protection."




24. Assuming the Checkout Plus button is selected, which is likely because of its large, prominent presentation and placement, the Aftership Protection fee is in the cart without the consumer intending to add it.



25. At the time Plaintiff and the putative Class members made their purchases, the "Aftership" toggle displayed above was *pre-selected*, and the Aftership fee was *automatically* added to the consumer's cart. The pre-toggled box above is designed to go unnoticed by consumers and engineered to force consumers to affirmatively opt-out of the junk fee in order to avoid it.

26. Discovery will confirm the exact format of the pre-selected toggle encountered by Plaintiff.

27. This pre-selection and automatic opting-in of consumers to junk fees is itself deceptive.

28. As the FTC notes, "For years, unscrupulous direct-mail and brick-and-mortar retailers have used design tricks and psychological tactics such as pre-checked boxes, hard-to-find-and read disclosures, and confusing cancellation policies, to get consumers to give up their money or data." *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers, September 15, 2022* (available at https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers). The FTC further notes in its *Enforcement Policy Statement Regarding Negative Option Marketing* that **"[a] 'pre-checked box' does not constitute affirmative consent."** https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf Fn. 46 at pg. 13 (emphasis added).

## III. Aftership's Add-On Fees Obscure and Misrepresent Consumers True Shipping Costs

29. Even beyond the deceptive way in which Aftership's "Aftership Protection" fee is added to the cart, a reasonable consumer also has more reason to confuse an automatically added shipping protection fee as mandatory rather than optional because it is separate from any basic free

shipping promised by the e-commerce retailer.

30. As described herein, e-commerce websites that use Aftership's widget promise "free" shipping on certain orders and a flat-rate price for shipping on other orders. These are clear promises that the total, marginal cost of having products shipped—that is, moved from the retailer to the consumer—are represented by the "free" or flat-rate shipping price representation.

31. However, Aftership decided it could actually charge more for shipping, thereby increasing profitability for both Aftership and the e-commerce retailer, by misrepresenting the true shipping costs to consumers.

32. Aftership knew or should have known that reasonable consumers would interpret these additional shipping-related charges as mandatory components of delivery, particularly where the charges are automatically added and presented only after consumers have substantially completed the checkout process.

33. On information and belief, a significant portion of the fee does not even go toward providing "Protection" (i.e., ensuring the customer the refund they would already be entitled to) but instead goes toward Aftership's and e-commerce retailers' profits.

## IV. <u>**Defendant's Fees are Junk Fees and Violate Federal Guidance**</u>

34. Under federal law, this practice is called a "negative option," which is "'an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.'" 16 C.F.R. § 310.2(w) (2025). Negative options are routinely found to violate federal laws, including the Restore Online Shoppers' Confidence Act ("ROSCA").

35. Defendant's shipping fees, such as the Aftership fee, are precisely the type of "Junk Fee" that have come under government scrutiny in recent years:

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

Federal Trade Commission, FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees, October 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

36. In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising," the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart." See Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures in Digital Advertising at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

37. Defendant violates federal guidance and Maryland law by adding the shipping fees as line items well after the consumer "add[s] to shopping cart," and by failing to disclose the nature of these fees.

38. Just last month, the companies that operate the Hopper travel apps have agreed to pay $35 million and will be prohibited from deceiving consumers about fees to settle the Federal Trade Commission's allegations that they unfairly charged users without their consent for "Tip" and VIP Support fees that the company claimed were optional yet were hidden and pre-selected

for consumers. See Fed. Trade Comm'n, Travel App Hopper to Pay $35 Million to Settle FTC Allegations It Charged Fees Without Consent and Deceived Users About Fees and Benefits of Some Products, July 2, 2026, available at https://www.ftc.gov/news-events/news/press-releases/2026/07/travel-app-hopper-pay-35-million-settle-ftc-allegations-it-charged-fees-without-consent-deceived "Hopper deceived consumers by showing them a total price that did not include hidden, pre-selected fees," said Christopher Mufarrige, Director of the FTC's Bureau of Consumer Protection. *Id*.

## V. Plaintiff's Experience

39. On November 4, 2024, Plaintiff purchased clothing items from retailer Flag Nor Fail's website.

40. When using the website, Plaintiff was repeatedly informed that he would get free or pre-paid shipping as part of his purchase.

41. However, his purchase included a $2.00 charge for "Aftership Protection" that was automatically and surreptitiously added to his cart, that—for the reasons described above—in fact represented an additional shipping charge.

42. Plaintiff did not know the charge existed or could be removed prior to his purchase.

43. Plaintiff would not have purchased Aftership if he knew it was optional.

## CLASS ALLEGATIONS

44. Plaintiff brings this action on behalf of himself, and all other similarly situated persons. The proposed Class is defined as:

> All persons, within the applicable statute of limitations preceding the filing of this action to the date of class certification, paid a Aftership fee or other similar fee for a service provided by Aftership.

45. Excluded from the Class are Defendant, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

46. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

47. **Numerosity (Rule 23(a)(1)).** The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. Defendant has the administrative capability through its computer systems and other business records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

48. **Commonality (Rule 23(a)(2)).** The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

a. Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

b. Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

c. Whether Defendant's alleged conduct constitutes violations of the laws asserted;

d. Whether Plaintiff and members of the Class were harmed by Defendant's misrepresentations;

e. Whether Defendant was unjustly enriched;

f. Whether Plaintiff and the Class have been damaged, and if so, the proper measure of damages; and

g. Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct described herein.

49. **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Defendant, as described herein.

50. Plaintiff is a more than adequate representative of the Class in that Plaintiff is Defendant's customer and has suffered damages as a result of Defendant's misrepresentations. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of consumer class actions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class

action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

51. **Predominance & Superiority (Rule 23(b)(3)).** Common questions of fact or law concerning Aftership's liability to all class members for charging Aftership fees on transactions that didn't give class members any appreciable benefit would predominate over any questions affecting only individual class members. Plaintiff's proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class members' individual claims before the Court, especially where, as here, individual class members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent outcomes. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

52. **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to each of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

53. **Particular Issues (Rule 23(c)(4)).** Plaintiff satisfies the requirements for maintaining a class action under Rule 23(c)(4). Plaintiff's claims consist of particular issues that are common to all members of the Class and are capable of class-wide resolution that will significantly advance the litigation.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Ann., Com. Law § 13-101, et seq.**
**(On Behalf of Plaintiff and the Maryland Subclass)**

54. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55. Plaintiff brings this claim individually and on behalf of the members of the proposed Maryland Subclass.

56. The Maryland Consumer Protection Act ("MCPA") prohibits any person from engaging in an "unfair, abusive, or deceptive trade practice" in, among other things, "the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services" and "the offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services." Md. Code Ann., Com. Law § 13-303(1)-(2).

57. The MCPA defines "unfair, abusive, or deceptive trade practices" to include, among other things: (a) any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," *id*. § 13-301(1); (b) "[f]ailure to state a material fact if the failure deceives or tends to deceive," *id*. § 13-301(3); and (c) "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service," *id*. § 13-301(9)(i).

58. Defendant's conduct, as described herein, constitutes unfair, abusive, and deceptive trade practices in violation of Md. Code Ann., Com. Law §§ 13-301 and 13-303, including but not limited to: (a) Designing, marketing, and deploying a checkout widget that automatically adds the

"Aftership Protection" fee to consumers' shopping carts through pre-selected, opt-out toggles or checkboxes, rather than requiring consumers to affirmatively opt in; (b) Failing to disclose, at the time consumers begin shopping or decide to purchase, that an additional "Aftership Protection" fee will later be added to their transaction; (c) Designing the widget to introduce the fee only after consumers have already invested time selecting products, entering payment information, and proceeding toward final purchase, and to display the fee and any means of declining it in a manner calculated to be overlooked; (d) Misrepresenting, through the design, naming, and placement of the fee, that the "Aftership Protection" charge is a mandatory component of shipping or checkout, when in fact it is a separate, optional add-on product distinct from the "free" or flat-rate shipping already promised by the retailer; and (e) Concealing and failing to disclose the true nature and optional character of the fee with the intent that consumers rely on that concealment in completing their purchase.

59. These practices had, and continue to have, the capacity, tendency, and effect of deceiving and misleading reasonable consumers, including Plaintiff, regarding the true total cost of their purchases and the optional nature of the "Aftership" fee.

60. The misrepresented and omitted facts described above were material because they related to the price consumers would actually pay and to whether a charge was mandatory or optional, and a reasonable consumer would have considered these facts important in deciding whether to complete the transaction or to decline the fee.

61. Defendant knew or should have known, through its design, marketing, and encouragement of pre-selected, opt-out fee toggles, that its conduct was unfair, abusive, and deceptive within the meaning of the MCPA.

62. Plaintiff and Maryland Subclass members relied on Defendant's omissions and the deceptive design of the checkout widget in completing their purchases without realizing that the "Aftership Protection" fee had been added and would not have paid the fee had it been adequately disclosed and presented as optional.

63. As a direct and proximate result of Defendant's unfair, abusive, and deceptive trade practices, Plaintiff and Maryland Subclass members suffered actual injury and loss in the form of the improperly assessed "Aftership Protection" fees and are entitled to recover damages pursuant to Md. Code Ann., Com. Law § 13-408(a).

64. Plaintiff and the Maryland Subclass are further entitled to an award of reasonable attorneys' fees pursuant to Md. Code Ann., Com. Law § 13-408(b), and to such other relief, including restitution and injunctive relief, as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

65. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

66. To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

67. Plaintiff and the Class conferred a benefit on Defendant.

68. Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

69. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

70. Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees

received by Defendant as a result of its inequitable conduct as more fully stated herein.

**THIRD CLAIM FOR RELIEF**
**Tortious Interference with Contract**
**(On Behalf of Plaintiff and the Class)**

72. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

73. Plaintiff and the Class have contracted with e-commerce retailers, including Scentiment, for the purchase of merchandise.

74. Defendant had knowledge of the contractual relationship or prospective contractual relationship between e-commerce retailers and Class members like Plaintiff.

75. Defendant engaged in conduct that prevented or hindered the performance of the contract between e-commerce retailers and the Class by (a) deceptively adding fees into consumers' carts; (b) deceptively naming and describing its fees; (c) charging Plaintiff and Class members for shipping above and beyond what was promised to them; and (d) charging fees that provide no added value to consumers when reasonable consumers, like Plaintiff, would not knowingly choose to pay them, absent Defendant's deception.

76. Defendant intended to prevent or hinder performance of the contract between e-commerce retailers and the Class, including Plaintiff. As a result, Plaintiff and the Class were harmed.

77. Defendant's conduct as described herein substantially caused the harm inflicted on Plaintiff and the Class.

**FOURTH CLAIM FOR RELIEF**
**Fraudulent Concealment**
**(On Behalf of Plaintiff and the Class)**

78. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing

paragraphs as if fully set forth herein.

79. Defendant concealed and suppressed material facts concerning the existence, amount, and non-mandatory nature of the "Aftership" fee, including the fact that the fee was pre-selected by default and would be automatically added to Plaintiff's and Class members' purchases unless affirmatively removed.

80. Defendant was under a duty to disclose these material facts to Plaintiff and the Class because Defendant designed, controlled, and implemented the checkout widget and interface through which the fee was presented to consumers.

81. Defendant intentionally concealed and suppressed these material facts with the intent to defraud Plaintiff and the Class and to induce them to pay a fee they would not otherwise have knowingly agreed to pay.

82. Plaintiff and the Class were unaware of the concealed facts and would not have acted as they did, including by paying the "Aftership" fee, had they known the truth.

83. Plaintiff and the Class reasonably relied on Defendant's concealment and omissions in completing their purchases.

84. As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff and the Class have suffered damages in an amount to be proven at trial, including the amount of the "Aftership" fees paid.

85. Defendant's conduct was undertaken with knowledge of the probable dangerous consequences to Plaintiff's and Class members' property, and with willful and conscious disregard of Plaintiff's and Class members' rights, such that an award of punitive damages is warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class demands a jury trial on all claims so triable and judgment as follows:

(a) Certifying the proposed Class, appointing Plaintiff as representatives of the Class, and appointing Plaintiff's counsel as class counsel for the proposed Class;

(b) For declaratory and injunctive relief as set forth above;

(c) For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d) For compensatory damages according to proof;

(e) For punitive damages according to proof;

(f) For reasonable attorneys' fees and costs of suit;

(g) For pre-judgment interest at the maximum rate permitted by applicable law; and

(h) Awarding such other and further relief as this Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: September 14, 2026

By: */s/ Lauren J. Kelleher*

Lauren J. Kelleher (Bar No. 22134)
Neel K. Lalchandani (Bar No. 20291)
Andrew D. Freeman (Bar No. 03867)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
(410) 962-1030 Office
(410) 385-0869 Fax
lkelleher@browngold.com

nlalchandani@browngold.com
adf@browngold.com

**KALIELGOLD PLLC**
Amanda J. Rosenberg (Cal. Bar No. 278507)
Sophia G. Gold (Cal. Bar No. 307971)
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
arosenberg@kalielgold.com
sgold@kalielgold.com

Jeffrey D. Kaliel (D.C. Bar No. 983578)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com

*Attorneys for Plaintiff and the Putative Class*